**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DAVID A. TAYLOR (Cal. Bar No. 247433)
(dtaylor@kbkllp.com)
THOMAS B. RUPP (Cal. Bar No. 278041)
(trupp@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Proposed Attorneys for the Debtor and
Debtor in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SANTA ROSA DIVISION

In re:

WINDSCAPE APARTMENTS LLC,[1]

Debtor.

Case No. 24-10417 (CN)

Chapter 11

**DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

**Date:** TBD
**Time:** TBD
**Place:** United States Bankruptcy Court
1300 Clay Street, Courtroom 215
Oakland, CA 94612

---

[1] The last four digits of the Debtor's tax identification number are 7353. The address for service on the Debtor is 6359 Auburn Blvd., Suite B, Citrus Heights, CA 95621.

I, Bradley D. Sharp, do hereby declare as follows:

1. I am the President and Chief Executive Officer of Development Specialists, Inc. ("DSI"), a leading provider of management consulting and financial advisory services, including turnaround consulting, fiduciary roles, and financial restructuring services, with numerous offices throughout the country.

2. I have more than 30 years of experience providing crisis management, financial advisory, and third-party fiduciary services. I have operated and sold publicly and privately-held troubled companies in and out of bankruptcy. I have also served as an expert witness with respect to banking, finance, and securitizations. Some of my relevant experience includes the following matters:

    a. Chief Restructuring Officer of Woodbridge Group of Companies, LLC, a real estate development company, through its 305 related debtors with more than 8,000 investors and claims of $1 billion.

    b. Chapter 11 Trustee for Namco Capital Group, Inc., a West Los Angeles-based real estate investment company through which $3 billion flowed between 2003 and 2008 with investments in over 100 real estate projects.

    c. Chief Restructuring Officer of Variant Holding Company, LLC, a parent company controlling 26 different multi-family properties with more than 8,000 units in five states.

Each of the above engagements included allegations of fraud and required a significant forensic accounting analysis performed under my supervision.

3. Prior to joining DSI, I was a vice president and senior commercial loan collection officer with Bank of America, NT&SA. I had been with the bank, through its acquisition of Security Pacific National Bank, since 1985. I have a Bachelor's of Science in accounting, with an emphasis in business computer information systems, from Colorado Mesa University in Grand Junction, Colorado.

4. I am a director and member of the Executive Committee for the American Bankruptcy Institute. I am also a fellow of the American College of Bankruptcy as well as the Assistant Treasurer of the International Insolvency Institute.

\*\*\*

5. LeFever Mattson, a California corporation ("LeFever Mattson"), manages a large real estate portfolio. Timothy LeFever and Kenneth W. Mattson each own 50% of the equity in LeFever Mattson.

6. LeFever Mattson directly or indirectly controls or has ownership interests in five limited liability companies (collectively, the "LLCs"), including the Debtor, and approximately 40 limited partnerships (collectively, the "LPs"). LeFever Mattson invests in real estate primarily through the LLCs and the LPs. LeFever Mattson also owns a number of properties directly. This structure has allowed LeFever Mattson to pool capital by selling limited partnership or membership interests to outside investors, while typically reserving an ownership interest for itself as general partner or managing member.

7. LeFever Mattson also has ownership interests in four California corporations (collectively, the "Subsidiary Corporations," and, collectively with LeFever Mattson, the LLCs, and the LPs, the "LM Affiliates"): (i) Home Tax Service of America, Inc., dba LeFever Mattson Property Management (the "Property Manager"), which provides property management services, including to those properties owned by the LM Affiliates; (ii) California Investment Properties, a California corporation, which is a real estate brokerage; (iii) Pineapple Bear, a California corporation, which offers hospitality and catering services; and (iv) Harrow Cellars, a California corporation, which operates a winery and related businesses.

8. I currently serve as a financial advisor to LeFever Mattson. I expect to become the Chief Restructuring Officer of LeFever Mattson and a number of the LM Affiliates, including the Debtor, if and when those additional entities commence chapter 11 proceedings.

9. On August 6, 2024, (the "Petition Date") the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, thereby commencing the above-captioned chapter 11 case (the

"Chapter 11 Case"). Additional LM Affiliates, including LeFever Mattson itself, may commence similar filings in the coming weeks.

10. To minimize the adverse effects of filing for bankruptcy protection on its business, the Debtor has filed several motions requesting various types of "first day" relief (collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtor to perform and meet those obligations necessary to fulfill its duties as debtor in possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful resolution to this Chapter 11 Case, and (c) best serves the Debtor's estate and creditors' interests.

11. I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the First Day Motions. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge; information supplied to me by other members of the Debtor's management, employees, and professionals; information learned from my review of relevant documents; or my opinion given my experience and my knowledge of the Debtor's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Debtor to submit this declaration.

12. Part I of this declaration describes the Debtor's business, its secured and unsecured debt, and the circumstances surrounding the commencement of this Chapter 11 Case. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

### I. THE DEBTOR'S BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11

#### A. The Mattson Transactions

13. Since my engagement on July 18, 2024, I have worked closely with LeFever Mattson and the Debtor in their efforts to maximize enterprise value in the wake of what, in retrospect and on information and belief, was a decade or more of financial misconduct by Mr. Mattson.

14. Mr. Mattson appears to have used LeFever Mattson and certain of the LPs and LLCs, including the Debtor, to facilitate a years-long campaign of self-serving transactions, many of which were not recorded in the books and records of LeFever Mattson, the Debtor, or any of the other LPs or LLCs (collectively, the "Mattson Transactions"). Investigation into the Mattson Transactions is ongoing. However, on information and belief, the transactions took two primary forms.

15. First, Mr. Mattson purported to sell equity interests in certain LPs and LLCs, including the Debtor, through transactions that, on information and belief, were unknown to Mr. LeFever and not recorded in the books and records of LeFever Mattson, the Debtor, or any of the other LPs or LLCs (collectively, the "Mattson Interest Sales"). The proceeds of the Mattson Interest Sales appear to have gone ultimately to Mr. Mattson, rather than to LeFever Mattson, the Debtor, or any of the other LPs or LLCs. Several LPs and LLCs are subject to lawsuits, including a putative class action, by investors claiming to have purchased legitimate LP or LLC interests through transactions with Mr. Mattson—though, on information and belief, those alleged transactions and interests were unknown to Mr. LeFever and not recorded in the books and records of LeFever Mattson, the Debtor, or any of the other LPs or LLCs.

16. Second, on information and belief, Mr. Mattson caused certain LPs and LLCs, including the Debtor, to purchase properties owned by Mr. Mattson's own investment companies—by executing the transactions himself on behalf of both buyer and seller (collectively, the "Mattson Property Sales"). Some of the Mattson Property Sales were at inflated prices and conveyed properties encumbered by high-interest loans, some of which are now in default. The Mattson Property Sales have clouded title on a significant portion of the LeFever Mattson real estate portfolio.

17. LeFever Mattson and the Debtor believe it likely that a complex, jointly-administered bankruptcy case will be necessary to fairly and transparently resolve the uncertainty that the Mattson Transactions have created for the LM Affiliates and their stakeholders.

## B. Overview of the Debtor's Corporate Structure, History, and Business

18. The Debtor was organized as a Delaware limited liability company on or about August 8, 2018. The sole member of the Debtor is Windscape Holdings, LLC, a California limited liability company ("Holdings LLC"). LeFever Mattson is the sole manager of Holdings LLC. Holdings LLC is owned by four members (the "Holdings LLC Members"): three LeFever Mattson LPs (Douglas Fir Investments, LP; Windscape Apartments I, LP; and Windscape Apartments II, LP), and one limited partnership, Perris Freeway Plaza LP, that, on information and belief, is controlled by Mr. Mattson.

19. The Debtor owns 19 units of real property (the "Properties"). The Properties are a mix of commercial, residential, office, mixed-use, and vacant land, located in Sonoma, Solano, and Placer Counties. The Properties are managed by the Property Manager through a set of management agreements. The Debtor has no employees. The Debtor generates income from rents (the "Rents") from the Properties and uses the proceeds to fund its operations.

## C. The Debtor's Secured and Unsecured Debt

20. As shown in the Debtor's *List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* [Dkt. No. 2] (the "Top-20 List"), the Debtor does not have any significant trade debt to vendors, suppliers, or professionals. The Debtor's only non-insider unsecured debt is prepaid rent or security deposits held for tenants of the Properties.

21. The debtor does owe some unsecured debt to insiders, including LM Affiliates, that it has incurred in the ordinary course of business to meet expenses.

22. Nine secured lenders (the "Secured Lenders") appear to hold deeds of trust and assignments of rents on the Properties.

23. Seven of the Secured Lenders have senior liens: (i) Butcher Road Partners LLC ("Butcher Road"); (ii) Chase Bank ("Chase"); (iii) Citizens Business Bank ("Citizens"); (iv) Comerica Commercial Lending Services ("Comerica"); (v) Duggans Mission Chapel, a California corporation ("Duggans"); (vi) Poppy Bank; and (vii) Socotra Capital ("Socotra"). The eighth Secured Lender, Mr. James J. Walker, holds a second-position (junior to Socotra) deed of trust and assignment of rents on one of the Properties, 24160 Turkey Road, in Sonoma County.

Keller Benvenutti Kim LLP
425 Market Street, 26th Floor
San Francisco, California 94105

Case: 24-10417   Doc# 25   Filed: 08/14/24   Entered: 08/14/24 15:16:33   Page 6 of 15

24. The Holdings LLC Members appear to hold a second-position (junior to Socotra) deed of trust and assignment of rents on one of the Properties, 18701 Gehricke Road, in Sonoma County. This document states that it is security for a $2,000,000 loan from the Mattson Partnership (as defined below) to the Holdings LLC Members. Based on the Debtor's preliminary review of other transactions between the LM Affiliates and the Mattson Partnership, the Debtor has reason to doubt that this amount is truly outstanding. It is investigating further.

25. One property, 18935 5th Street West in Sonoma County, has a recorded notice of tax lien in the amount of $6,716.

26. The Debtor has not completed a thorough review and analysis of the entirety of the Secured Lenders' loan documents. As mentioned above, the original borrower on many of the loans was an entity controlled by Mr. Mattson, such that final loan documents may not be in the possession of the Debtor or Lefever Mattson.

### D. Events Leading Up to Chapter 11 Filing

27. On information and belief, on September 16, 2022, Mr. Mattson caused KS Mattson Partners L.P. (the "Mattson Partnership"), a partnership that he beneficially owns, to purchase two adjoining parcels of real property located at (i) 525 W. Napa Street and (ii) 520, 530, and 532 Studley Street, in Sonoma, California, (the "Duggans Parcels") from Duggans Mission Chapel, a California corporation ("Duggans"), for $6,500,000. The Mattson Partnership financed the purchase in part with a $4,875,000 loan from Duggans at 5% interest, documented in a promissory note dated September 9, 2022 (the "Duggans Note").

28. On information and belief, on November 1, 2022, Mattson caused the Mattson Partnership to sell the Duggans Parcels to the Debtor for $7,500,000, still encumbered by the Duggans Note.

29. On information and belief, Mr. Mattson did not cause required payments to be made on the Duggans Note, including a principal reduction payment in the amount of $1,675,000, such that Duggans noticed a trustee's sale of the Duggans Parcels for August 7, 2024 (the "Sale Date").

30. The Debtor was unable to negotiate a forbearance with Duggans prior to the Sale Date. Accordingly, on the Petition Date, to stay the trustee's sale of the Duggans Parcels and help

preserve and maximize enterprise value for the benefit of the Debtor's stakeholders, the Debtor filed its voluntary chapter 11 petition.

31. The Debtor believes that there is meaningful equity value in the Duggans Parcels and intends to engage a broker to market and sell the property.

## II. FIRST DAY MOTIONS[2]

### A. Motion for Authority to Use Cash Collateral

32. Through this First Day Motion, the Debtor requests entry of an interim order authorizing the Debtor to use the cash collateral (the "Cash Collateral") of the Secured Lenders who appear to hold deeds of trust and assignments of rents on the Properties.

33. The secured loans from Chase and Citizens were all incurred with the knowledge of LeFever Mattson and the Debtor. On information and belief, the Debtor came to own the Property that secures the Poppy Bank loan through a Mattson Property Sale; it cured defaults on this loan prior to the Petition Date. To the Debtor's knowledge, the loans from Chase, Citizens, and Poppy Bank are current, with no defaults existing prior to the Petition Date. The subject Properties for these loans are also generating net positive rental income.

34. The loan from Comerica secured by the Property at 400 W. Spain Street was incurred with the knowledge of LeFever Mattson and the Debtor. Because the Property at 400 W. Spain Street is not generating Rents, Comerica does not have any interest in Cash Collateral.

35. Although Butcher Road is an LM Affiliate, the Debtor believes that Butcher Road's loan and security agreement was effected by Mr. Mattson. The Debtor reserves all rights with respect to the note or security interest of Butcher Road. The three Properties for which Butcher Road appears to have security interests are undeveloped land and are not currently generating income, so Butcher Road does not have an interest in Cash Collateral. The Debtor is not currently seeking authority to use the Cash Collateral of any other Secured Lender to operate or maintain the collateral of Butcher Road.

---

[2] Capitalized terms used in Part II of this Declaration but not otherwise defined shall have the meanings given to them in the First Day Motion to which the paragraphs relate.

36. Socotra is the Secured Lender on 11 of the Properties (the "Socotra Properties"). On information and belief, the Debtor came to own the Socotra Properties through Mattson Property Sales. The Debtor continues to investigate the Mattson Property Sales and reserves all rights with respect to Socotra and the Socotra Properties.

37. Mr. James J. Walker holds a second-position deed of trust and assignment of rents on the Socotra Property at 24160 Turkey Road, in Sonoma County.

38. The Holdings LLC Members appear to hold second-position deed of trust and assignment of rents on the Socotra Property at 18701 Gehricke Road, in Sonoma County. The Holdings LLC Members are affiliates and insiders of the Debtor.

39. Neither of the two Socotra Properties with second liens discussed in the preceding two paragraphs are generating Rents, so neither Mr. Walker nor the Holdings LLC Members have any interest in Cash Collateral.

40. Duggans and the Duggans Note are discussed in Paragraphs 27-31, above.

41. Although the Debtor is only seeking authority to use the Cash Collateral for an interim period through September 30, 2024, a traditional 13-week budget (on a cash basis) for the anticipated use of Cash Collateral broken out by each of the Properties is attached hereto as **Exhibit A** (the "Budget"). Notwithstanding the Budget, the Debtor will not use any of the Cash Collateral until the Court authorizes it to do so.

42. As described above, the Debtor anticipates that a number of LM Affiliates may file chapter 11 petitions in this Court within the next 30 days, and that a new omnibus motion for authority to use cash collateral would be filed at that time. During this interim period, the Debtor seeks permission to use cash to manage the Properties and sustain its business, consistent with the Budget. As set forth in the Budget, this will involve expenditures of approximately $256,579 over this interim period, of which $68,011 is adequate protection payments to certain Secured Lenders.

43. This First Day Motion seeks narrow relief to pay only expenses necessary to maintain the Properties and, for that reason, the Debtor believes that the Secured Lenders would generally approve of the relief requested herein. Given the number of Secured Lenders and the

other urgent priorities that the Debtor and LeFever Mattson are addressing, the Debtor did not attempt to separately negotiate consents with each of the Secured Lenders.

44. According to the applicable terms of the deeds of trust and assignments of rent for the Properties, only Rents and proceeds from the Properties incurred after an event of default would be the Cash Collateral of the Secured Lenders. Because the Debtor and the Property Manager duly account for all revenues and expenses on a property-by-property basis, the Debtor submits that segregating the funds into 21 separate accounts would be unduly burdensome to the estate and provide little if any benefit to the Secured Lenders, given the other adequate protection they enjoy.

45. The Budget demonstrates that many of the Secured Lenders enjoy significant equity cushions on the Properties. The balances owed to the Secured Creditors, the Debtor's estimated fair market value of the Properties, and the equity cushion for each loan is shown on the first page of the Budget. The balances owed are based on the Debtor's books and records, and the estimated value is the most recent purchase price for the Properties, which were purchased during 2021-2022. Although the Debtor has not undertaken formal appraisals of each of the Properties in anticipation of this Motion, the Budget shows that the current balance of the loan for each Property is substantially less than that Property's purchase price in most instances.

46. A substantial amount of value is associated with the going concern value of the Debtor's Properties, as compared to a forced liquidation through a foreclosure. In large part this is driven by the substantial increase in prices that can be achieved through an orderly, managed liquidation in contrast to a "fire sale" in which the Debtor is forced to sell the Properties immediately at depressed values. The Properties' values can be preserved only if the Debtor continues to operate and manage them in a responsible manner, which requires that it fund the ordinary expenses of its operations. Continuing to operate maintains the value of the Properties for the Secured Lenders, as well as the Debtor's other creditors and equity holders and is, in and of itself, a means of adequately protecting the Secured Creditors' property interests.

47. The Budget also provides for adequate protection payments to Chase, Citizens, and Poppy Bank, in the same amounts as the prepetition debt service for their respective loans.

## B. Motion to Approve Cash Management System

48. Through this First Day Motion, the Debtor requests entry of an interim order approving the continued use of its current cash management system, bank account (the "Bank Account"), and business forms.

49. The Property Manager manages the Properties for the Debtor. As the Debtor's agent, the Property Manager holds the Rents in a trust account maintained with Citizens, the Bank Account, under the title "Home Tax Service of America, Inc. dba LeFever Mattson Property Management, Windscape Apartments Trust Account."

50. As of the Petition Date, the Property Manager maintains a cash management and disbursement system (the "Cash Management System") on behalf of the Debtor in the ordinary course of its operations. Attached hereto as **Exhibit B** is a chart describing the flow of funds through the Cash Management System. Citizens is an FDIC-insured institution and a U.S. Trustee Authorized Depository for debtors in possession in the Northern District of California.

51. The Rents are deposited into the Bank Account through one of four methods: (1) automated clearing house ("ACH") deposits; (2) credit or debit card payments; (3) checks; and (4) third-party payment systems.[3] Over half of the Debtor's apartment residents make automatic monthly payments through ACH or by credit or debit card. Those payments are (and must be) set up through the Property Manager's online tenant portal and are thereby automatically allocated to the appropriate Property and unit.

52. Closing the Bank Account would break the automated connection between it and the tenants' bank accounts, the credit and debit card companies, or third-party payment systems. Residents would then have to manually pay their rent by mailing checks to the Property Manager, which would take longer to receive and add the risk of payments being denied for insufficient funds. Those without printed checks would need to go to the expense and hassle of purchasing money orders or cashier's checks. This would delay the Property Manager's receipt of the Rents, thus disrupting and delaying the Debtor's cash flow.

---

[3] These include the walk-in payment system, WIPS, which allows residents to pay rent with cash and Flexible Finance Inc. which is a rent-financing system that allows residents to pay in two installments over the course of a month instead of the traditional monthly payment.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

53. From time to time, and in the ordinary course of business, the Debtor incurs certain obligations for the maintenance of the Cash Management System. These obligations primarily consist of amounts owed to Citizens for the maintenance of and services related to the Bank Account (the "Cash Management Fees"). The Cash Management Fees for the Bank Account are withdrawn from the Bank Account periodically throughout the month depending on the service needed. The total of the Cash Management Fees averages approximately $500 per month. The Debtor estimates that, other than the July and August prepetition Cash Management Fees, there are no other accrued, unpaid, and undisputed prepetition amounts outstanding as of the date hereof on account of the Cash Management Fees. Accordingly, the Debtor seeks authorization to pay any Cash Management Fees up to an aggregate amount of $1,000 on an interim basis.

54. In the ordinary course of business, the Debtor issues checks and uses a variety of business forms, including, but not limited to, leases and invoices (collectively, the "Business Forms"). To prevent disruption to residents, tenants, suppliers and other vendors from new forms or otherwise complying with Bankruptcy Local Rule 2015-1(a), pursuant to this First Day Motion, the Debtor seeks authority to continue using its Business Forms substantially in the form used immediately prior to the Petition Date, without reference therein to the Debtor's status as "Debtor in Possession." The Debtor does not believe that any prejudice will be suffered by any party if this relief is granted.

55. The Cash Management System is an ordinary-course and essential business practice that provides significant benefits to the Debtor, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, reduce administrative expenses by facilitating the movement of funds, and ensure the availability of timely and accurate account balance information consistent with prepetition practices. Accordingly, the continued use of the Cash Management System without interruption is vital to the success of this Chapter 11 Case.

56. If the Debtor is required to significantly alter the way in which the Property Manager collects and disburses cash throughout the Cash Management System, its operations will likely experience disruptions, which will negatively impact the Debtor's estate to the detriment of

all parties in interest. In furtherance of the foregoing, this First Day Motion requests that the Property Manager and Citizens be authorized to continue to administer the Bank Account as it was maintained prepetition, without interruption, in the ordinary course of business.

57. In this Chapter 11 Case, strict enforcement of the applicable *United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtors in Possession* would disrupt the Debtor's ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses. The Bank Account is maintained at a bank designated as an "authorized depository" by the U.S. Trustee. The opening of a new bank account would increase operating costs because the entire Cash Management System would have to be recreated, and the resulting delay from redirecting payments would negatively impact the Debtor's ability to operate its business to the disadvantage of all parties in interest.

58. The Debtor believes that its transition into chapter 11 will be significantly smoother and more orderly, with minimum disruption and harm to its operation, if the Bank Account continues with the same account number following the Petition Date. By preserving business continuity and avoiding the disruption and delay to the Debtor's collection and disbursement procedures that would necessarily result from closing the Bank Account and opening a new one, all parties in interest, including vendors, tenants, and creditors will be best served.

C. **Motion to Extend Time to File Schedules and Statement**

59. Through this First Day Motion, the Debtor requests entry of an order extending the initial fourteen (14) day period to file its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules and Statement") by thirty (30) days, to allow the Debtor a total of forty-four (44) days after the Petition Date to file its Schedules and Statement (the "Schedules and Statement Deadline"), without prejudice to the Debtor's right to request additional time if necessary.

60. Collecting the necessary information to prepare the Schedules and Statement requires an enormous expenditure of time and effort on the part of the Debtor and its professionals.

61. Due to the scheduled foreclosure sale of the Duggans Parcels, the Debtor was forced to file its bankruptcy petition on an accelerated basis, and before the LM Affiliates had fully

evaluated their own potential filings. If, as is likely, other LM Affiliates file their own petitions in the coming weeks, it will be far more efficient for the Debtor to file its Schedules and Statement together with those of its LM Affiliates that file bankruptcy petitions.

62. Requiring the Debtor instead file its Schedules and Statement by the current deadline would deprive the Debtor and the LM Affiliates of (a) the ability to give the Court and parties in interest a comprehensive picture of their financial history and condition, and (b) the economies of scale achieved by preparing all of the Schedules and Statement together.

63. The proposed Schedules and Statement Deadline is far enough in the future to accommodate the LM Affiliates' decision-making on whether to file petitions. It will allow the Debtor and the petitioning LM Affiliates to prepare these substantial documents at the same time, saving the Debtor's estate time and money.

[*Signature on Next Page*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 14, 2024.

                                                        */s/ Bradley D. Sharp*
                                                       Bradley D. Sharp